UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MONDELĒZ INTERNATIONAL, INC., a Virginia corporation and INTERCONTINENTAL GREAT BRANDS LLC, a Delaware corporation, ) ) ) ) ) | No. |
| Plaintiffs, ) ) | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| v. ) ) ALDI, INC., an Illinois corporation, ) | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiffs Mondelēz International, Inc. and its intellectual property holding company and subsidiary Intercontinental Great Brands LLC (collectively "Mondelēz") hereby allege as follows:

**<u>NATURE OF THE ACTION</u>**

1.      This is a Complaint for damages and injunctive relief arising from Defendant Aldi, Inc.'s ("Defendant" or "Aldi") use of private label product packaging that blatantly copies and trades upon the valuable reputation and goodwill Mondelēz has developed in its longstanding, highly distinctive, and well-known trade dress for numerous of its cookie and cracker snack products. Defendant has a pattern and practice of engaging in the unlawful behavior underlying Mondelēz's claims. Defendant's actions are likely to deceive and confuse consumers and dilute the distinctive quality of Mondelēz's unique product packaging, and if not stopped, threaten to irreparably harm Mondelēz and its valuable brands. Mondelēz seeks damages and injunctive relief based upon Defendant's willful trademark infringement, trade dress infringement, unfair competition, unjust enrichment and dilution under federal and state law.

**PARTIES**

1.      Mondelēz International, Inc. is a Virginia corporation with its global corporate headquarters located at 905 West Fulton Market, Suite 200, Chicago Illinois, 60607. Intercontinental Great Brands LLC is a Delaware limited liability company with its principal place of business at 100 Deforest Avenue, East Hanover, NJ 07936.  Intercontinental Great Brands LLC is a wholly owned subsidiary of Mondelēz International, Inc. and owner and registrant of Mondelēz International, Inc.'s intellectual property rights in the products alleged in this Complaint.

2.      Mondelēz is informed and believes that Defendant is an Illinois corporation which owns and operates Aldi grocery stores throughout the United States, including in this District.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over the claims in this action under 28 U.S.C. §§ 1331, 1338(a) and (b), because this action involves claims of trademark infringement, trade dress infringement, unfair competition, unjust enrichment and dilution arising under the Lanham Act, 15 U.S.C. § 1125. This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367, because the state law claims are so related to the federal claims that they form part of the same case or controversy.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(d) because Defendant resides in this District, has infringed Mondelēz's trademark and trade dress rights in this District, and/or a substantial part of the events giving rise to the claims in this action occurred in this District.

**FACTS**

5.      Mondelēz is one of the world's largest multinational food companies and does business in over 150 countries. Mondelēz manufactures and sells a wide variety of packaged snacks, including cookies and crackers, in grocery stores, among many other channels, around the world.

6.      Mondelēz is a prominent leader in the cookie and crackers snack industry with

several universally recognizable and iconic brands sold in the United States including OREO®, WHEAT THINS®, NUTTER BUTTER®, CHIPS AHOY!®, NILLA WAFERS®, RITZ®, and PREMIUM®.

7.     Consumers instantly recognize snacks sold under these popular food brands through their highly distinctive product packaging.

8.     Defendant's business model involves an emphasis on low-priced private label products that resemble the look and feel of well-known brands. For this reason, Defendant is often referred to as a "discount" supermarket. Defendant is well known for its television advertisements featuring the slogan "like brands, only cheaper."

9.     Defendant is in the business of selling private label cookie and cracker snacks and has a pattern and practice of selling products in packaging that are unacceptable copies of Mondelēz's trade dress. Because of this misconduct, Mondelēz has a history of enforcing its intellectual property rights against Defendant. Indeed, Mondelēz has contacted Defendant on numerous occasions objecting to Defendant's use of confusingly similar packaging and demanding that Defendant cease and desist its unlawful infringement. For example, Mondelez previously contacted Defendant about copycats of Mondelez's OREO® cookie design, TEDDY GRAHAMS® cookies, BELVITA® biscuits, TATE'S BAKE SHOP cookies, and TRISCUIT® crackers.  Defendant discontinued and/or changed certain of these infringing products in response to Mondelēz's objections. However, Defendant has continued its pattern and practice of selling products in packaging which infringes the trade dress of numerous Mondelēz products. Specifically, as to the products in suit in this action (shown below), Defendant has ignored Mondelēz's reasonable requests, leaving Mondelēz no choice but to bring this trademark and trade dress infringement, dilution, unfair competition and unjust enrichment action.  Defendant's willful infringement must be stopped, and Mondelēz is entitled to recover the significant damages it has suffered.

| Mondelēz Trade Dress | Infringing Aldi Trade Dress |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |



10.     Mondelēz is informed and believes that at least some of the products in suit are manufactured and distributed nationally to Aldi stores from a supplier or suppliers located in the State of Ohio.

**MONDELĒZ'S OREO TRADE DRESS**

11.     The OREO brand was first introduced to the United States market in 1912 (the "Oreo cookies"). Oreo cookies are sandwich cookies which consist of two biscuits with a sweet cream filling. Oreo cookies come in a variety of flavors.

12.     Oreo cookies have become the world's top selling cookies and are sold in more than 100 countries worldwide.

13.     Since at least as early as 2009, Mondelēz has marketed and sold Oreo cookies in a highly distinctive product packaging (the "OREO Trade Dress") which consumers associate with

Mondelēz. The OREO Trade Dress is depicted below:



14.    The OREO Trade Dress features the following inherently distinctive elements.

   a.   A prominent cookie consisting of a white filling sandwiched between two black biscuits marked with a distinctive embossment of ridges forming a rim along the circumference, which is slightly tilted to the right;

   b.   A predominantly blue background with a lighter blue halo around the cookie;

   c.   A white milk splash design;

   d.   A thick, sans-serif white font designating the product name, which is in a curved shape and all capital letters outlined in blue, that begins with the letters 'OR' and partially covers the cookie;

   e.   A small, thick sans-serif white font for verbiage near the product name;

   f.   A logo in white letters, surrounded by a thin white shape, and enclosed in a red background in the upper left corner.

15.    Mondelēz has acquired common law rights owing to a long, rich history of continuously using prominent elements of the OREO Trade Dress as demonstrated in Exhibit A.

16.    The OREO Trade Dress is unique, distinctive, arbitrary, and non-functional, meaning it is not essential to its purpose and does not affect its cost or quality. Nor is it competitively necessary to use the OREO Trade Dress in the snack products market. Indeed,

there are numerous examples of third parties selling competing products with non-infringing trade dress. *See* Exhibit B. The distinctive features included in the OREO Trade Dress serve the purpose of identifying and distinguishing Oreo cookies from the products of other sellers.

17.     Mondelēz has spent hundreds of millions of dollars in the last five years alone in connection with advertising and promoting its goods featuring the OREO Trade Dress in the United States market and has enjoyed substantial sales and success. Indeed, Mondelēz has sold over 650 million packages featuring the OREO Trade Dress in the United States market in the last five years alone. Mondelēz's promotion efforts include, among other things, print media, internet advertising (including social media), television commercials, sponsorships, promotions, public relations, in-store promotional and point-of-sale materials.

18.     Mondelēz has used and continues to use the OREO Trade Dress uniformly and consistently, and as source identifiers of its highly regarded Oreo cookies.

19.     As a result of its extensive promotional efforts, advertising, sales, and enforcement, Mondelēz enjoys a highly valuable reputation and goodwill that is symbolized by its OREO Trade Dress, whereby it has become recognized as denoting goods originating from Mondelēz and none other.

## DEFENDANT'S WILLFUL INFRINGEMENT OF OREO TRADE DRESS

20.     To benefit from the reputation, fame and prestige of the OREO Trade Dress and exploit Mondelēz's marketing effort, Defendant is marketing and selling private label packaged cookie sandwiches using packaging that blatantly copies the distinctive and iconic elements of the OREO Trade Dress (the "Infringing Sandwich Cookie Packaging").  The Infringing Sandwich Cookie Packaging is likely to cause confusion among consumers. Representative side-by-side comparisons of Mondelēz's OREO Trade Dress and the Infringing Sandwich Cookie Packaging are shown as follows:

 

21.     Like the OREO Trade Dress, the Infringing Sandwich Cookie Packaging features a prominent cookie consisting of a white filling sandwiched between two black biscuits marked with ridges forming a rim along the circumference, which is slightly tilted to the right; a predominantly blue background, which Mondelēz has featured on its Oreo cookie packaging since 1952, with a lighter blue halo around the cookie; hints of white milk splashes; thick, sans-serif white font designating the product name, which Mondelēz has featured on its Oreo cookie packaging since 1972, and which is in a curved shape and all capital letters outlined in blue, that begins with the letters 'OR' and partially covers the cookie; where both the cookie and product name appear in a substantially similar location on the package as in the OREO Trade Dress; and a small, thick sans-serif white font for verbiage near the product name, which Mondelēz has featured on its Oreo cookie packaging since 1965; and a logo in white letters, surrounded by a thin white shape, and enclosed in a red background in the upper left corner, which Mondelēz has featured on its Oreo cookie packaging since 1960.

22.     The Infringing Sandwich Cookie Packaging and the OREO Trade Dress are used in connection with identical goods, namely, packaged sandwich cookies.

23.     Defendant adopted the Infringing Sandwich Cookie Packaging with knowledge of Mondelēz's prior rights in the OREO Trade Dress and with intent to mislead or confuse consumers into believing that Defendant's goods are provided, sponsored, or approved by, or affiliated with, Mondelēz.

24.     Given the distinctiveness of the OREO Trade Dress, Defendant's use of nearly identical packaging for identical products, and in the same marketing channels, to the same class of consumers, and is likely to cause confusion regarding the source and nature of Defendant's products, and/or that Defendant's products come from, are affiliated with, or are sponsored or endorsed by Mondelēz, when in fact no such affiliation, sponsorship, or endorsement exists, lessens the distinctiveness of the OREO Trade Dress, and unfairly competes. As a result of Defendant's wrongful activities, consumers have been misled and will continue to be misled, the OREO Trade Dress has been and will continue to be diluted, Defendant has been unjustly enriched, and Mondelēz has suffered and continues to suffer irreparable harm and economic injury.

## MONDELĒZ'S WHEAT THINS TRADE DRESS

25.     The WHEAT THINS brand was first introduced to the United States market in 1947 (the "Wheat Thins crackers").

26.     Since at least as early as 2017, Mondelēz has marketed and sold Wheat Thins crackers in a highly distinctive product packaging (the "WHEAT THINS Trade Dress") which consumers associate with Mondelēz. The WHEAT THINS Trade Dress is depicted below:



27.     The WHEAT THINS Trade Dress features the following inherently distinctive elements:

      a.     A predominantly yellow background with an ombre effect producing a lighter shade near, and a progressively darker shade away from, the center of the packaging;

      b.     Prominent use of the words 'WHEAT' and 'THINS' in a blue, serif font in a downward curved shape;

      c.      The word 'original' in a bolded white font, against a background consisting of an orange shape and positioned beneath the product name;

      d.     Crackers, crumbs, cheese, and a wheat plant positioned together;

      e.     A logo in white letters, surrounded by a thin white shape, and enclosed in a red background in the upper left corner.

28.     Mondelēz has acquired common law rights owing to a long, rich history of continuously using prominent elements of the WHEAT THINS Trade Dress, as demonstrated in Exhibit A.

29.     The WHEAT THINS Trade Dress is unique, distinctive, arbitrary, and non-functional, meaning it is not essential to its purpose and does not affect its cost or quality. Nor is it competitively necessary to use the WHEAT THINS Trade Dress in the snack products market. Indeed, there are numerous examples of third parties selling competing products with non-infringing trade dress. *See* Exhibit B. The distinctive features included in the WHEAT THINS Trade Dress serve the purpose of identifying and distinguishing Wheat Thins crackers from the products of other sellers.

30.     Mondelēz has spent tens of millions of dollars in the last five years alone in connection with advertising and promoting its goods featuring the WHEAT THINS Trade Dress in the United States market and has enjoyed substantial sales and success. Indeed, Mondelēz has sold over 200 million packages featuring the WHEAT THINS Trade Dress in the United States

market in the last five years alone. Mondelēz's promotion efforts include, among other things, print media, internet advertising (including social media), television commercials, sponsorships, promotions, public relations, in-store promotional and point-of-sale materials.

31.     Mondelēz has used and continues to use the WHEAT THINS Trade Dress uniformly and consistently, and as a source identifier of its highly regarded Wheat Thins crackers.

32.     As a result of its extensive promotional efforts, advertising, and sales, Mondelēz enjoys a highly valuable reputation and goodwill that is symbolized by its WHEAT THINS Trade Dress, whereby it has become recognized as denoting goods originating from Mondelēz and none other.

**DEFENDANT'S WILLFUL INFRINGEMENT OF WHEAT THINS TRADE DRESS**

33.     To benefit from the reputation, fame and prestige of the WHEAT THINS Trade Dress and exploit Mondelēz's marketing effort, Defendant began marketing and selling private label packaged wheat crackers using packaging that blatantly copies the iconic and distinctive elements of the WHEAT THINS Trade Dress (the "Infringing Wheat Cracker Packaging"). The Infringing Wheat Cracker Packaging is likely to cause confusion among consumers. Representative side-by-side comparisons of Mondelēz's WHEAT THINS Trade Dress and the Infringing Wheat Cracker Packaging are shown as follows:

 

34.     Like the WHEAT THINS Trade Dress, the Infringing Wheat Cracker Packaging features a predominantly yellow background with an ombre effect producing a lighter shade near, and a progressive darker shade away from, the center of the packaging, which Mondelēz has featured on its Wheat Thins crackers packaging since 2008; prominent use of the word 'WHEAT' and a variation of 'THINS' in a blue, serif font, which Mondelēz has featured on its Wheat Thins crackers packaging since 2008, in a downward curved shape; the word 'original' in a bolded white font, against a background consisting of an orange shape and positioned beneath the product name; and crackers, crumbs, cheese, and a wheat plant positioned together in the bottom half of the background, which Mondelēz has featured on its Wheat Thins crackers packaging since 2004. Further, the packaging of both products features an identical product claim being used on the packaging in a similar format.

35.     The Infringing Wheat Cracker Packaging and the WHEAT THINS Trade Dress are used in connection with identical goods, namely, packaged wheat cracker snacks.

36.     Defendant adopted the Infringing Wheat Cracker Packaging with knowledge of Mondelēz's prior rights in the WHEAT THINS Trade Dress and with intent to mislead or confuse consumers into believing that Defendant's goods are provided, sponsored, or approved by, or affiliated with, Mondelēz.

37.     Given the distinctiveness of the WHEAT THINS Trade Dress, Defendant's use of nearly identical packaging for identical products, and in the same marketing channels, to the same class of consumers, and is likely to cause confusion regarding the source and nature of Defendant's products, and/or that Defendant's products come from, are affiliated with, or are sponsored or endorsed by Mondelēz, when in fact no such affiliation, sponsorship, or endorsement exists, lessens the distinctiveness of the WHEAT THINS Trade Dress, and unfairly competes. As a result of Defendant's wrongful activities, consumers have been misled and will continue to be misled, the WHEAT THINS Trade Dress has been and will continue to be diluted, Defendant has been unjustly enriched, and Mondelēz has suffered and continues to suffer irreparable harm and economic injury.

## MONDELĒZ'S NUTTER BUTTER TRADE DRESS

38.     The NUTTER BUTTER peanut butter sandwich cookies ("Nutter Butter cookies") were first introduced to the United States market in 1969.

39.     Since at least as early as 2009, Mondelēz has marketed and sold Nutter Butter cookies in a highly distinctive product packaging (the "NUTTER BUTTER Trade Dress") which consumers associate with Mondelēz. The NUTTER BUTTER Trade Dress is depicted below:



40.     The NUTTER BUTTER Trade Dress features the following inherently distinctive elements:

    a.   A predominantly red background;

    b.   A prominent cookie consisting of a tan cream filling sandwiched between two

slightly darker tan biscuits marked with protruding vertical and horizontal lines which intersect to form a checkered pattern, and which is slightly slanted and surrounded by a halo;

c. A thick, stylized white font designating the product name, which is in a curved shape and partially covers the cookie, and of which the first letter of each word is capitalized;

d. A logo in white letters, surrounded by a thin white shape, and enclosed in a red background in the upper left corner.

41. Mondelēz has acquired common law rights owing to a long, rich history of continuously using prominent elements of the NUTTER BUTTER Trade Dress, as demonstrated in Exhibit A.

42. The NUTTER BUTTER Trade Dress is unique, distinctive, arbitrary, and non-functional, meaning it is not essential to its purpose and does not affect its cost or quality. Nor is it competitively necessary to use the NUTTER BUTTER Trade Dress in the snack products market. Indeed, there are numerous examples of third parties selling competing products with non-infringing trade dress. *See* Exhibit B. The distinctive features included in the NUTTER BUTTER Trade Dress serve the purpose of identifying and distinguishing Nutter Butter cookies from the products of other sellers.

43. Mondelēz has spent tens of millions of dollars in the last five years alone in connection with advertising and promoting its goods featuring NUTTER BUTTER Trade Dress in the United States market and has enjoyed substantial sales and success. Indeed, Mondelēz has sold approximately 150 million packages featuring the NUTTER BUTTER Trade Dress in the United States market in the last five years alone. Mondelēz's promotion efforts include, among other things, print media, internet advertising (including social media), television commercials, sponsorships, promotions, public relations, in-store promotional and point-of-sale materials. Mondelēz has used and continues to use the NUTTER BUTTER Trade Dress uniformly and consistently, and as a source identifier of its highly regarded Nutter Butter cookies.

- 14 -

44.     As a result of its extensive promotional efforts, advertising, and sales, Mondelēz enjoys a highly valuable reputation and goodwill that is symbolized by its NUTTER BUTTER Trade Dress, whereby it has become recognized as denoting goods originating from Mondelēz and none other.

**DEFENDANT'S WILLFUL INFRINGEMENT OF NUTTER BUTTER TRADE DRESS**

45.     To benefit from the reputation, fame and prestige of the NUTTER BUTTER Trade Dress and exploit Mondelēz's marketing effort, Defendant began marketing and selling private label packaged peanut butter sandwich cookies using packaging that blatantly copies the iconic and distinctive elements of the NUTTER BUTTER Trade Dress (the "Infringing Peanut Butter Cookie Packaging"). The Infringing Peanut Butter Cookie Packaging is likely to cause confusion among consumers. Representative side-by-side comparisons of Mondelēz's NUTTER BUTTER Trade Dress and the Infringing Peanut Butter Cookie Packaging are shown as follows:

 

46.     Like the NUTTER BUTTER Trade Dress, the Infringing Peanut Butter Cookie Packaging features a predominantly red background; a prominent cookie consisting of a tan cream filling sandwiched between two slightly darker tan biscuits marked with protruding vertical and horizontal lines which intersect to form a checkered pattern, and which is slightly slanted and surrounded by a halo; a thick, stylized white font designating the product name,

which is in a curve shape and partially covers the cookie, and of which the first letter of each word is capitalized; and a logo in white letters, surrounded by a thin white shape, and enclosed in a red background in the upper left corner.

47. The Infringing Peanut Butter Cookie Packaging and the NUTTER BUTTER Trade Dress are used in connection with identical goods, namely, packaged peanut butter sandwich cookies.

48. Defendant adopted the Infringing Peanut Butter Cookie Packaging with knowledge of Mondelēz's prior rights in the NUTTER BUTTER Trade Dress and with intent to mislead or confuse consumers into believing that Defendant's goods are provided, sponsored, or approved by Mondelēz.

49. Given the distinctiveness of the NUTTER BUTTER Trade Dress, Defendant's use of nearly identical packaging for identical products, and in the same marketing channels, to the same class of consumers, Defendant is likely to cause confusion regarding the source and nature of Defendant's products, and/or that Defendant's products come from, are affiliated with, or are sponsored or endorsed by Mondelēz, when in fact no such affiliation, sponsorship, or endorsement exists, lessens the distinctiveness of the NUTTER BUTTER Trade Dress, and unfairly competes. As a result of Defendant's wrongful activities, consumers have been misled and will continue to be misled, the NUTTER BUTTER Trade Dress has been and will continue to be diluted, Defendant has been unjustly enriched, and Mondelēz has suffered and continues to suffer irreparable harm and economic injury.

**MONDELĒZ'S CHIPS AHOY! TRADE DRESS**

50. The CHIPS AHOY! brand was first introduced to the United States market in 1963 with the CHIPS AHOY! chocolate chip cookies (the "Chips Ahoy! cookies").

51. Since at least as early as 2010, Mondelēz has marketed and sold Chips Ahoy! cookies in a highly distinctive product packaging (the "CHIPS AHOY! Trade Dress") which consumers associate with Mondelēz. The CHIPS AHOY! Trade Dress is depicted below:



52.     The CHIPS AHOY! Trade Dress features the following inherently distinctive elements:

        a.   A prominent chocolate chip cookie, of which only a portion is visible, to the right of the product name;

        b.   A predominantly blue background;

        c.   A thick font designating the product name, which is predominantly dark blue with red accents, against a white background;

        d.   A logo in white letters, surrounded by a thin white shape, and enclosed in a red background in the upper left corner.

53.     Mondelēz has acquired common law rights owing to a long, rich history of continuously using prominent elements of the CHIPS AHOY! Trade Dress, as demonstrated in Exhibit A.

54.     The CHIPS AHOY! Trade Dress is unique, distinctive, arbitrary, and non-functional, meaning it is not essential to its purpose and does not affect its cost or quality. Nor is it competitively necessary to use the CHIPS AHOY! Trade Dress in the snack products market. Indeed, there are numerous examples of third parties selling competing products with non-infringing trade dress. *See* Exhibit B. The distinctive features included in the CHIPS AHOY!

Trade Dress serve the purpose of identifying and distinguishing Chips Ahoy! cookies from the products of other sellers.

55.     Mondelēz has spent hundreds of millions of dollars in the last five years alone in connection with advertising and promoting its goods featuring the CHIPS AHOY! Trade Dress in the United States market and has enjoyed substantial sales and success. Indeed, Mondelēz has sold over 450 million packages featuring the CHIPS AHOY! Trade Dress in the United States market in the last five years alone. Mondelēz's promotion efforts include, among other things, print media, internet advertising (including social media), television commercials, sponsorships, promotions, public relations, in-store promotional and point-of-sale materials.

56.     Mondelēz has used and continues to use the CHIPS AHOY! Trade Dress uniformly and consistently, and as a source identifier of its highly regarded Chips Ahoy! cookies.

57.     As a result of its extensive promotional efforts, advertising, and sales, Mondelēz enjoys a highly valuable reputation and goodwill that is symbolized by its CHIPS AHOY! Trade Dress, whereby it has become recognized as denoting goods originating from Mondelēz and none other.

**DEFENDANT'S WILLFUL INFRINGEMENT OF CHIPS AHOY! TRADE DRESS**

58.     To benefit from the reputation, fame and prestige of the CHIPS AHOY! Trade Dress and exploit Mondelēz's marketing effort, Defendant is marketing and selling private label packaged chocolate chip cookies using packaging that blatantly copies the iconic and distinctive elements of the CHIPS AHOY! Trade Dress (the "Infringing Chocolate Chip Cookie Packaging"). The Infringing Chocolate Chip Cookie Packaging is likely to cause confusion among consumers. Representative side-by-side comparisons of Mondelēz's CHIPS AHOY! Trade Dress and the Infringing Chocolate Chip Cookie Packaging are shown as follows:

 

59.     Like the CHIPS AHOY! Trade Dress, the Infringing Chocolate Chip Cookie Packaging features a prominent chocolate chip cookie, of which only a portion is visible, to the right of the product name; a predominantly blue background which Mondelēz has featured on its Chips Ahoy! cookies packaging since 1964; a thick font designating the product name, which is predominantly dark blue with red accents, against a white background, which Mondelēz has featured on its Chips Ahoy! packaging since 1994; where both the cookie and product name are in a substantially similar location on the package as in the CHIPS AHOY! Trade Dress; and a logo in white letters, surrounded by a thin white shape, and enclosed in a red background in the upper left corner, which Mondelēz has featured on its Chips Ahoy! cookies packaging since 1972.

60.     The Infringing Chocolate Chip Cookie Packaging and the CHIPS AHOY! Trade Dress are used in connection with identical goods, namely, packaged snack chocolate chip cookies.

61.     Defendant adopted the Infringing Chocolate Chip Cookie Packaging with knowledge of Mondelēz's prior rights in the CHIPS AHOY! Trade Dress and with intent to mislead or confuse consumers into believing that Defendant's goods are provided, sponsored, or approved by, or affiliated with, Mondelēz.

62.     Given the distinctiveness of the CHIPS AHOY! Trade Dress, Defendant's use of nearly identical packaging for identical products, and in the same marketing channels, to the

same class of consumers, and is likely to cause confusion regarding the source and nature of Defendant's products, and/or that Defendant's products come from, are affiliated with, or are sponsored or endorsed by Mondelēz, when in fact no such affiliation, sponsorship, or endorsement exists, lessens the distinctiveness of the CHIPS AHOY! Trade Dress, and unfairly competes. As a result of Defendant's wrongful activities, consumers have been misled and will continue to be misled, the CHIPS AHOY! Trade Dress has been and will continue to be diluted, Defendant has been unjustly enriched, and Mondelēz has suffered and continues to suffer irreparable harm and economic injury.

## MONDELĒZ'S NILLA WAFERS TRADE DRESS

63.     The NILLA WAFERS brand was first introduced to the United States market in 1967 with the NILLA WAFERS vanilla wafer cookies (the "Nilla Wafers cookies").

64.     Since at least as early as 2009, Mondelēz has marketed and sold Nilla Wafers cookies in a highly distinctive product packaging (the "NILLA WAFERS Trade Dress") which consumers associate with Mondelēz. The NILLA WAFERS Trade Dress is depicted below:



65.     The NILLA WAFERS Trade Dress underwent a refresh effective January 2025 and will eventually fully replace the above 2009 version on shelves in stores:



66.     The NILLA WAFERS Trade Dress features the following inherently distinctive elements:

   a.  A predominantly yellow background with an ombre effect producing a lighter shade near, and a progressively darker shade away from, one portion of the packaging;

   b.  A thick, stylized red font prominently designating the first portion of the product name and a small, red font designating the second portion of the product name, which is positioned underneath the first portion of the product name;

   c.  An undulating row of cookies;

   d.  A logo in white letters, surrounded by a thin white shape, and enclosed in a red background in the upper left corner.

67.     Mondelēz has acquired common law rights owing to a long, rich history of continuously using prominent elements of the NILLA WAFERS Trade Dress with refreshes to the packaging used in connection with Nilla Wafer cookies, as demonstrated in Exhibit A.

68.     The NILLA WAFERS Trade Dress is unique, distinctive, arbitrary, and non-functional, meaning it is not essential to its purpose and does not affect its cost or quality. Nor is

it competitively necessary to use the NILLA WAFERS Trade Dress in the snack products market. Indeed, there are numerous examples of third parties selling competing products with non-infringing trade dress. *See* Exhibit B. The distinctive features included in the NILLA WAFERS Trade Dress serve the purpose of identifying and distinguishing Nilla Wafers cookies from the products of other sellers.

69.     Mondelēz has spent millions of dollars in the last five years alone in connection with advertising and promoting its goods featuring the NILLA WAFERS Trade Dress in the United States market and has enjoyed substantial sales and success. Indeed, Mondelēz has sold over 100 million packages featuring the NILLA WAFERS Trade Dress in the United States market in the last five years alone. Mondelēz's promotion efforts include, among other things, print media, internet advertising (including social media), television commercials, sponsorships, promotions, public relations, in-store promotional and point-of-sale materials.

70.     Mondelēz has used and continues to use the NILLA WAFERS Trade Dress uniformly and consistently, and as a source identifier of its highly regarded Nilla Wafers cookies.

71.     As a result of its extensive promotional efforts, advertising, and sales, Mondelēz enjoys a highly valuable reputation and goodwill that is symbolized by its NILLA WAFERS Trade Dress, whereby it has become recognized as denoting goods originating from Mondelēz and none other.

## DEFENDANT'S WILLFUL INFRINGEMENT OF NILLA WAFERS TRADE DRESS

72.     To benefit from the reputation, fame and prestige of the NILLA WAFERS Trade Dress and exploit Mondelēz's marketing effort, Defendant is marketing and selling private label packaged vanilla wafer cookies using packaging that blatantly copies the iconic and distinctive elements of the NILLA WAFERS Trade Dress (the "Infringing Wafer Cookie Packaging"). The Infringing Wafer Cookie Packaging is likely to cause confusion among consumers. Representative side-by-side comparisons of Mondelēz's NILLA WAFERS Trade Dress and the Infringing Wafer Cookie Packaging are shown as follows:

 

73.     Like the NILLA WAFERS Trade Dress, the Infringing Wafer Cookie Packaging features a predominantly yellow background with an ombre effect producing a lighter shade near, and a progressively darker shade away from, one portion of the packaging, which Mondelēz has featured on its Nilla Wafers cookies packaging since 2002; a thick, stylized red font prominently designating the first portion of the product name and a small, red font designating the second portion of the product name, which Mondelēz first featured on its Nilla Wafers cookies packaging in 1984, and which is positioned underneath the first portion of the product name; an undulating row of cookies; where both the cookies and the product name are in a substantially similar location on the package as in the NILLA WAFERS Trade Dress; and a logo in white letters, surrounded by a thin white shape, and enclosed in a red background in the upper left corner, which Mondelēz has featured on its Nilla Wafers cookies packaging since 1954.

74.     The Infringing Wafer Cookie Packaging and the NILLA WAFERS Trade Dress

are used in connection with identical goods, namely, packaged snack vanilla wafer cookies.

75. Defendant adopted the Infringing Wafer Cookie Packaging with knowledge of Mondelēz's prior rights in the NILLA WAFERS Trade Dress and with intent to mislead or confuse consumers into believing that Defendant's goods are provided, sponsored, or approved by, or affiliated with, Mondelēz.

76. Given the distinctiveness of the NILLA WAFERS Trade Dress, Defendant's use of nearly identical packaging for identical products, and in the same marketing channels, to the same class of consumers, and is likely to cause confusion regarding the source and nature of Defendant's products, and/or that Defendant's products come from, are affiliated with, or are sponsored or endorsed by Mondelēz, when in fact no such affiliation, sponsorship, or endorsement exists, lessens the distinctiveness of the NILLA WAFERS Trade Dress, and unfairly competes. As a result of Defendant's wrongful activities, consumers have been misled and will continue to be misled, the NILLA WAFERS Trade Dress has been and will continue to be diluted, Defendant has been unjustly enriched, and Mondelēz has suffered and continues to suffer irreparable harm and economic injury.

## MONDELĒZ'S RITZ TRADE DRESS

77. The RITZ brand was first introduced to the United States market in 1934 with the RITZ crackers ("Ritz crackers").

78. Since at least as early as 2021, Mondelēz has marketed and sold Ritz crackers in a highly distinctive product packaging (the "RITZ Trade Dress"), which consumers associate with Mondelēz. The RITZ Trade Dress is depicted below:



79. The RITZ Trade Dress features the following inherently distinctive elements:

   a. A predominantly red background;

   b. A large, thick yellow font prominently designating a portion of the product name, which is in all capital letters and begins with the letter 'R,' and a small, thin, font for the word 'CRACKERS' in all capital letters, which is positioned underneath the first portion of the product name, against a background consisting of a blue sphere outlined in yellow;

   c. A cracker with punctures forming a hexagon and an additional puncture in the center of a cracker;

   d. A cracker topped with a thin piece of cheese;

   e. Visible shadows underneath crackers;

   f. A logo in white letters, surrounded by a thin white shape, and enclosed in a red background in the upper left corner.

80. Mondelēz has acquired common law rights owing to a long, rich history of continuously using prominent elements of the RITZ Trade Dress, as demonstrated in Exhibit A.

81. The RITZ Trade Dress is unique, distinctive, arbitrary, and non-functional, meaning it is not essential to its purpose and does not affect its cost or quality. Nor is it competitively necessary to use the RITZ Trade Dress in the snack products market. Indeed, there are numerous examples of third parties selling competing products with non-infringing trade dress. *See* Exhibit B. The distinctive features included in the RITZ Trade Dress serve the purpose of identifying and distinguishing Ritz crackers from the products of other sellers.

82. Mondelēz has spent hundreds of millions of dollars in the last five years alone in connection with advertising and promoting its goods featuring the RITZ Trade Dress in the United States market and has enjoyed substantial sales and success. Indeed, Mondelēz has sold over 700 million packages featuring the RITZ Trade Dress in the United States market in the last five years alone. Mondelēz's promotion efforts include, among other things, print media, internet

advertising (including social media), television commercials, sponsorships, promotions, public relations, in-store promotional and point-of-sale materials.

83.     Mondelēz has used and continues to use the RITZ Trade Dress uniformly and consistently, and as a source identifier, of its highly regarded Ritz crackers.

84.     As a result of its extensive promotional efforts, advertising, and sales, Mondelēz enjoys a highly valuable reputation and goodwill that is symbolized by its RITZ Trade Dress, whereby it has become recognized as denoting goods originating from Mondelēz and none other.

## DEFENDANT'S WILLFUL INFRINGEMENT OF RITZ TRADE DRESS

85.     To benefit from the reputation, fame and prestige of the RITZ Trade Dress and exploit Mondelēz's marketing effort, Defendant began marketing and selling private label packaged snack crackers using packaging that blatantly copies the iconic and distinctive elements of the RITZ Trade Dress (the "Infringing Cracker Packaging"). The Infringing Cracker Packaging is likely to cause confusion among consumers.  Representative side-by-side comparisons of Mondelēz's RITZ Trade Dress and the Infringing Cracker Packaging are shown as follows:

 

86.     Like the RITZ Trade Dress, the Infringing Cracker Packaging features a predominantly red background, which Mondelēz has featured on its Ritz crackers packaging since 1934; a large, thick font prominently designating a portion of the product name, which is in all capital letters and begins with the letter 'R,' which Mondelēz has featured on its Ritz crackers

packaging since 1934, and a small, thin, font for the word 'CRACKERS' in all capital letters, which is positioned underneath the former portion of the product name, which Mondelēz has used since 1948, against a background consisting of a blue shape which Mondelēz has used since 1934, outlined in yellow; a cracker with punctures forming a hexagon and an additional puncture in the center of the cracker, which Mondelēz has featured on its Ritz crackers packaging since 1934; a cracker topped with a thin piece of cheese, which Mondelēz has featured on its Ritz crackers packaging since 2006; and visible shadows underneath crackers, which Mondelēz has featured on its Ritz crackers packaging since 1994. Further, the packaging of both products features the parties' respective logos in white letters in the upper left corner of the packaging, which Mondelēz has featured on its Ritz crackers packaging since 1952.

87.    The Infringing Cracker Packaging and the RITZ Trade Dress are used in connection with identical goods, namely, packaged snack crackers.

88.    Defendant adopted the Infringing Cracker Packaging with knowledge of Mondelēz's prior rights in the RITZ Trade Dress and with intent to mislead or confuse consumers into believing that Defendant's goods are provided, sponsored, or approved by, or affiliated with, Mondelēz.

89.    Given the distinctiveness of the RITZ Trade Dress, Defendant's use of nearly identical packaging for identical products, and in the same marketing channels, to the same class of consumers, and is likely to cause confusion regarding the source and nature of Defendant's products, and/or that Defendant's products come from, are affiliated with, or are sponsored or endorsed by Mondelēz, when in fact no such affiliation, sponsorship, or endorsement exists, lessens the distinctiveness of the RITZ Trade Dress, and unfairly competes. As a result of Defendant's wrongful activities, consumers have been misled and will continue to be misled, the RITZ Trade Dress has been and will continue to be diluted, Defendant has been unjustly enriched, and Mondelēz has suffered and continues to suffer irreparable harm and economic injury.

## MONDELĒZ'S PREMIUM TRADE DRESS

90.     The PREMIUM saltine crackers ("Premium saltine crackers") were first introduced to the United States market in 1876.

91.      Since at least as early as 2011, Mondelēz has marketed and sold Premium saltine crackers in a highly distinctive product packaging (the "PREMIUM Trade Dress") which consumers associate with Mondelēz. The PREMIUM Trade Dress is depicted below:



92.     The PREMIUM Trade Dress features the following inherently distinctive elements:

a.   A light blue and white background;

b.   Prominent use of the product name in a blue font, which is darker than the background, in all capital letters in the center of the packaging and aligned to the left;

c.   Use of the word 'original' in a light blue font above the product name;

d.   A white, blue-rimmed bowl of red soup positioned next to crackers on the far right side of the packaging and cut off by the right edge of the packaging;

e.   A logo in white letters, surrounded by a thin white shape, and enclosed in a red background in the upper left corner.

93.     Mondelēz has acquired common law rights owing to a long, rich history of continuously using prominent elements of the PREMIUM Trade Dress as demonstrated in Exhibit A.

94.     The PREMIUM Trade Dress is unique, distinctive, arbitrary, and non-functional,

meaning it is not essential to its purpose and does not affect its cost or. Nor is it competitively necessary to use the PREMIUM Trade Dress in the snack products market. Indeed, there are numerous examples of third parties selling competing products with non-infringing trade dress. *See* Exhibit B. The distinctive features included in the PREMIUM Trade Dress serve the purpose of identifying and distinguishing Premium saltine crackers from the products of other sellers.

95.     Mondelēz has spent millions of dollars over the last five years alone in connection with advertising and promoting its goods featuring PREMIUM Trade Dress in the United States and has enjoyed substantial sales and success. Indeed, Mondelēz has sold over 400 million packages featuring the PREMIUM Trade Dress in the United States market since 2020 alone. Mondelēz's promotion efforts include, among other things, print media, internet advertising (including social media), television commercials, sponsorships, promotions, public relations, in-store promotional and point-of-sale materials.

96.     Mondelēz has used and continues to use the PREMIUM Trade Dress uniformly and consistently, and as a source identifier of its highly regarded Premium saltine crackers.

97.     As a result of its extensive promotional efforts, advertising, and sales, Mondelēz enjoys a highly valuable reputation and goodwill that is symbolized by its PREMIUM Trade Dress, whereby it has become recognized as denoting goods originating from Mondelēz and none other.

### DEFENDANT'S WILLFUL INFRINGEMENT OF PREMIUM TRADE DRESS

98.     Defendant is marketing and selling private label packaged saltine crackers using packaging that blatantly copies the iconic and distinctive elements of the PREMIUM Trade Dress (the "Infringing Saltine Cracker Packaging"). The Infringing Saltine Cracker Packaging is likely to cause confusion among consumers. Representative side-by-side comparisons of Mondelēz's PREMIUM Trade Dress and the Infringing Saltine Cracker Packaging are shown as follows:

 

99.     Like the PREMIUM Trade Dress, the Infringing Saltine Cracker Packaging features a light blue and white background; prominent use of the product name in a blue font, which is darker than the background, in all capital letters in the center of the packaging and aligned to the left; use of the word 'original' in a light blue font above the product name, which Mondelēz has featured on its Premium saltine crackers packaging since 1994; and a white, blue-rimmed bowl of red soup positioned next to crackers, which Mondelēz has featured on its Premium saltine crackers packaging since 1986, on the far right side of the packaging and cut off by the right edge of the packaging. Further, the packaging of both products features the parties' respective logos in white letters in the upper left corner, which Mondelēz has featured on its Premium saltine crackers packaging since 1952.

100.    The Infringing Saltine Cracker Packaging and the PREMIUM Trade Dress are used in connection with identical goods, namely, packaged saltine crackers.

101.    Defendant adopted the Infringing Saltine Cracker Packaging with knowledge of Mondelēz's prior rights in the PREMIUM Trade Dress and with intent to mislead or confuse consumers into believing that Defendant's goods are provided, sponsored, or approved by, or affiliated with Mondelēz.

102.    Given the distinctiveness of the PREMIUM Trade Dress, Defendant's use of nearly identical packaging for identical products, and in the same marketing channels, to the same class of consumers, and is likely to cause confusion regarding the source and nature of Defendant's products, and/or that Defendant's products come from, are affiliated with, or are

sponsored or endorsed by Mondelēz, when in fact no such affiliation, sponsorship, or endorsement exists, lessens the distinctiveness of the PREMIUM Trade Dress, and unfairly competes. As a result of Defendant's wrongful activities, consumers have been misled and will continue to be misled, Defendant has been unjustly enriched, and Mondelēz has suffered and continues to suffer irreparable harm and economic injury.

## FIRST CAUSE OF ACTION

### Federal Trade Dress Infringement

### *15 U.S.C. § 1125(a)*

103.    Mondelēz realleges and incorporates herein by reference the allegations set forth in Paragraphs 1 through 114 as though fully set forth herein.

104.    The OREO Trade Dress, WHEAT THINS Trade Dress, NUTTER BUTTER Trade Dress, CHIPS AHOY! Trade Dress, NILLA WAFERS Trade Dress, RITZ Trade Dress, and PREMIUM Trade Dress (collectively, the "Mondelēz Trade Dresses") are inherently distinctive.

105.    In the alternative, the Mondelēz Trade Dresses have acquired distinctiveness through extensive and long-standing, exclusive use.

106.    The Mondelēz Trade Dresses are non-functional.

107.    Mondelēz's creation, adoption, and use of the Mondelēz Trade Dresses predates Defendant's adoption and use of the Infringing Cookie Sandwich Packaging, Infringing Wheat Cracker Packaging, Infringing Peanut Butter Cookie Packaging, Infringing Chocolate Chip Cookie Packaging, Infringing Wafer Cookie Packaging, Infringing Cracker Packaging, and Infringing Saltine Cracker Packaging, respectively (collectively, the "Infringing Products").

108.    Defendant continues to use the Infringing Products in connection with private label cookie and cracker snacks, without authorization from Mondelēz, and engage in a pattern and practice of unlawfully copying Mondelēz Trade Dresses.

109.    Defendant's acts have caused and are likely to cause confusion, mistake, or deception in the minds of the public as to affiliation, connection, or association of Mondelēz with

Defendant, and as to the origin, sponsorship, or approval by Mondelēz of Defendant's goods.

110.    Defendant's acts constitute willful trade dress violation of the Mondelēz Trade Dresses in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Defendant has a pattern and practice of copying Mondelēz's snack product packaging.

111.    Defendant's acts have injured Mondelēz and damaged Mondelēz in an amount to be determined at trial.

112.    Defendant's acts have caused and will continue to cause irreparable injury to Mondelēz.

113.    Such irreparable injury will continue unless Defendant is preliminarily and permanently enjoined by this Court from further violation of Mondelēz's rights, and for which Mondelēz has no adequate remedy at law.

114.    Defendant, by its marketing and sale of the Infringing Products, seeks to ride the coattails of the substantial reputation of the Mondelēz Trade Dresses in order to benefit from its power of attraction, fame and/or prestige, and to exploit the marketing effort expended by Mondelēz. Defendant's clear intent is to take advantage of the reputation of the Mondelēz Trade Dresses to assist it to sell the Infringing Products.

**SECOND CAUSE OF ACTION**

**Federal Trademark Dilution**

***15 U.S.C. § 1125(c)***

115.    Mondelēz realleges and incorporates herein by reference the allegations set forth in Paragraphs 1 through 126 as though fully set forth herein.

116.    The OREO Trade Dress is distinctive and "famous" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

117.    The WHEAT THINS Trade Dress is distinctive and "famous" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

118.    The NUTTER BUTTER Trade Dress is distinctiveness and "famous" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

119.    The CHIPS AHOY! trade dress is distinctive and "famous" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

120.    The NILLA WAFERS Trade Dress is distinctive and "famous" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

121.    The RITZ Trade Dress is distinctive and "famous" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

122.    Defendant continues to use the Infringing Cookie Sandwich Packaging, Infringing Wheat Cracker Packaging, Infringing Peanut Butter Cookie Packaging, Infringing Chocolate Chip Cookie Packaging, Infringing Wafer Cookie Packaging, and Infringing Cracker Packaging in connection with private label snack cookies, without Mondelēz's authorization.

123.    Defendant's conduct constitutes trademark dilution of the OREO Trade Dress, the WHEAT THINS Trade Dress, the NUTTER BUTTER Trade Dress, the CHIPS AHOY! Trade Dress, the NILLA WAFERS Trade Dress, and the RITZ Trade Dress in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

124.    Defendant's unlawful conduct is willful. Defendant has a pattern and practice of copying Mondelēz's snack product packaging.

125.    As a result of Defendant's conduct, Mondelēz has suffered and will continue to suffer damage.

126.    Defendant's activities have caused and will continue to cause irreparable harm to Mondelēz and to the substantial goodwill embodied in the OREO Trade Dress, the WHEAT THINS Trade Dress, the NUTTER BUTTER Trade Dress, the CHIPS AHOY! Trade Dress, the NILLA WAFERS Trade Dress, and the RITZ Trade Dress, and such acts will continue unless restrained by this Court.

**THIRD CAUSE OF ACTION**

**Unfair Competition**

*815 ILCS 505 et seq.*

127.     Mondelēz realleges and incorporates herein by reference the allegations set forth in Paragraphs 1 through 138 as though fully set forth herein.

128.     Defendant, by its marketing and sale of the Infringing Products, seeks to ride the coattails of the substantial reputation of the Mondelēz Trade Dresses to benefit from its power of attraction, fame and/or prestige, and to exploit the marketing effort expended by Mondelēz. Defendant's clear intent is to take advantage of the reputation of the Mondelēz Trade Dresses in order to assist it to sell the Infringing Products.

129.     Defendant's use of the Infringing Products described above constitute unfair competition in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 *et seq.*, as they are likely to deceive and mislead the public.

130.     Defendant's acts of unfair competition have caused and will continue to cause Mondelēz irreparable harm. Mondelēz has no adequate remedy at law for Defendant's unfair competition.

131.     Mondelēz is entitled to judgment enjoining and restraining Defendant from engaging in further acts of infringement and unfair competition.

132.     Defendant intended to take advantage of the reputation of Mondelēz's Trade Dresses to assist it in selling the Infringing Products. Defendant has a pattern and practice of copying Mondelēz's snack product packaging. Defendant has achieved significant sales of the Infringing Products over a short period of time without any promotion.  Defendant took advantage of the reputation Mondelēz has developed in its products. Defendant's sales of the Infringing Products without promotion evidences the advantage to Defendant and that advantage is unfair because it enabled Defendant to profit from Mondelēz's investment in developing and promoting its branded products, rather than Defendant competing purely on quality and price and/or its own promotional efforts.

## FOURTH CAUSE OF ACTION

### Dilution

*Ohio Common Law*

133.    Mondelēz realleges and incorporates herein by reference the allegations set forth in Paragraphs 1 through 143 as though fully set forth herein.

134.    Defendant continues to use the Infringing Products in connection with cookie and cracker snacks, without authorization from Mondelēz.

135.    Mondelēz is informed and believes that at least some of the Infringing Products are manufactured in and distributed from the state of Ohio.

136.    Defendant's conduct constitutes trademark dilution of the Mondelēz Trade Dresses in violation of Ohio common law.

137.    Defendant's unlawful conduct is willful. Defendant has a pattern and practice of copying Mondelēz's snack product packaging.

138.    As a result of Defendant's conduct, Mondelēz has suffered and will continue to suffer damage.

139.    Defendant's activities have caused and will continue to cause irreparable harm to Mondelēz and to the substantial goodwill embodied in the Mondelēz Trade Dresses, and such acts will continue unless restrained by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Mondelēz prays for relief as follows:

A.    Permanent injunctive relief, enjoining and prohibiting Defendant, or its agents, servants, employees, officers, attorneys, successors and assigns, and all others in active concert or participation with Defendant, from:

      i.    Using the Mondelēz Trade Dresses, or any versions thereof, in connection with the offer to sell and/or the sale of any product;

      ii.    Selling the Infringing Products or other altered versions of the Infringing Products in violation of Mondelēz's trademark and/or trade dress rights; and

      iii.    Assisting, aiding, or abetting any other person or entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (iv)

above.

B.   An award of damages in an amount to be determined at trial;

C.   An award of treble damages as provided by the Lanham Act, 18 U.S.C. § 1117(b);

D.   An award of attorneys' fees and costs;

E.   An award of punitive damages in an amount to be determined at trial; and

F.   Any further relief the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues in this case.

Dated: May 27, 2025                              Respectfully submitted,


By: /s/James T. Hultquist
    James T. Hultquist (SBN 6204320)
    Email:    jhultquist@reedsmith.com
    REED SMITH LLP
    10 South Wacker Drive
    Chicago, IL 60606-7507
    Telephone: +1 312 207 1000
    Facsimile: +1 312 207 6400

    Robert N. Phillips (SBN 120970) (*Pro Hac Vice Admission Pending*)
    Email:    robphillips@reedsmith.com

    Seth B. Herring (SBN 253907) (*Pro Hac Vice Admission Pending*)
    Email:    sherring@reedsmith.com
    Fatima Mobin (SBN 354140) (*Pro Hac Vice Admission Pending*)
    Email:    fmobin@reedsmith.com
    REED SMITH LLP
    101 Second Street
    Suite 1800
    San Francisco, CA 94105-3659
    Telephone: +1 415 543 8700
    Facsimile: +1 415 391 8269

    *Counsel for Plaintiffs*